Kevin MOSS

v.

**FORMOSA PLASTICS CORPORATION.**

No. CIV.A. 98–0594–B–M1.

United States District Court, M.D. Louisiana.

June 1, 2000.

Jill Leininger Craft, Craft—McKenzie, Baton Rouge, LA, Richard Paul Bullock, Baton Rouge, LA, for Kevin Moss, plaintiffs.

Jerry L. Stovall, Jr., Breazeale, Sachse & Wilson, Baton Rouge, LA, for Formosa Plastics Corporation, defendants.

### RULING ON DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

POLOZOLA, Chief Judge.

The defendant Formosa Plastic Corporation ("Formosa") has filed a motion for summary judgment.[1] For reasons set

---

1. Rec. Doc. No. 22.

forth below, this motion is hereby GRANTED.

## 1. BACKGROUND FACTS AND PROCEDURAL HISTORY

In February of 1990, Formosa hired the plaintiff Kevin Moss ("Moss"). In 1996, Formosa promoted Moss to the position of "Panel Board Operator," a position he held until being placed on leave by Formosa in December of 1997.

Moss was diagnosed with partial motor complex epilepsy in 1996. The plaintiff took various medications in an effort to control the side effects of his epilepsy, including Dilantin, Tegretol, Topomax.[2] On May 13, 1997, Moss suffered what was apparently a epileptic seizure while at his work station in the control room of Formosa's Caustic Chlorine Plant. The plaintiff maintains that this episode resulted as a side effect of the prescription medications he was taking for his condition.[3] Several of Moss's co-workers were present at the scene shortly after this seizure began.[4] Moss had a more severe seizure on June 29, 1997 while he was working by himself in the control room. On that day, Moss felt an impending seizure and called his supervisor over the radio. When his co-workers arrived on the scene, they found Moss unconscious. Moss does not recall how long he was unconscious or what happened during the period of unconsciousness, although one of his supervi-

sors reported that he was incapacitated for approximately forty minutes.[5] After the June 29, 1997 incident, Moss took medical leave and saw a series of doctors at the direction of Formosa. Two of the doctors opined that Moss could not safely return to work because of his epilepsy.[6]

At some point in July of 1997, Moss also saw his treating neurologist who concluded that Moss was fit to return to work. Moss produced a note to this effect from the doctor. The doctor later admitted, however, that he did not know what activities Moss performed at Formosa at the time when he wrote the note.[7]

In late August and early September of 1997, Moss saw another neurologist on two occasions. The neurologist ultimately concluded that Moss should not "work in a position in which he could harm himself or someone else during his period of unconsciousness."[8]

After the June 29, 1997 seizure, Formosa placed Moss on medical leave. Moss applied for and was granted short term disability payments during this leave period. These benefits were set to expire at the end of December of 1997. At some point in the fall of 1997, Formosa decided to terminate Moss's employment due to his medical problems and the various doctor's opinions regarding his condition.[9] Formosa notified Moss of this decision. Subsequently, Formosa decided not to terminate

---

2. Rec. Doc. No. 28, p. 2.

3. Rec. Doc. No. 1, ¶ 8; Rec Doc. No. 28. p. 2.

4. Keith Baltazar, one of Moss's co-workers, was called to the scene on May 13, 1997 and asked to remove Moss from the room. In an affidavit submitted by the defendants, he testified that Moss was on all fours when he arrived. He further said: "Mr. Moss appeared to be disoriented and hyperventilating * * * I helped Mr. Moss get to his feet and I took him to the water fountain. Mr. Moss was shaking, he was weak in the knees, he could not support himself, he appeared extremely scared and disoriented." Rec. Doc. No. 24, Exhibit "I" (affidavit of Keith Baltazar). Another of Moss's co-workers reported

that "he fell on all fours and punched the control panel with his fist." Rec. Doc. No. 24, Exhibit "G" (affidavit of Heath Monte).

5. Rec. Doc. No. 24, Exhibit "A" (Excerpt of Kevin Moss's deposition) p. 51; Exhibit "B" (Affidavit of Paul Heurtevant).

6. Rec. Doc. No. 24, Exhibit "M."

7. Rec. Doc. No. 24, Exhibit "M", p. 34, 44 (deposition of Steven Zuckerman, M.D.).

8. Rec. Doc. No. 24, Exhibit "O", p. 22 (Deposition of Neil Smith, M.D.).

9. Rec. Doc. No. 24, Exhibits "D", p. 4; "F", p. 4.

Moss and instead placed him on unpaid leave pursuant to the Family and Medical Leave Act("FMLA") to allow him to "get his situation under control."[10] To this end, Formosa recommended that Moss seek a third opinion regarding his condition and ability to work at Formosa.[11]

On March 31, 1998, Moss produced a note from a doctor who opined that Moss was fit to return to work, but should not do work that involved climbing ladders or working at heights.[12] The same doctor then wrote a note in May of 1998 indicating that Moss was "ok to return to work—but should not be responsible for managing toxic chemicals."[13] Formosa then elected to terminate Moss's employment on June 30, 1999, due to his medical condition.

## 2. STANDARD FOR SUMMARY JUDGMENT:

Summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment."[14] The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial."[15] A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[16] If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."[17]

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial.[18] The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence.[19] Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[20] The court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[21] Unless

10. Rec. Doc. No. 24, Exhibits "D", p. 4; "F", p. 4.

11. Rec. Doc. No. 24, Exhibit "D", p. 5; "F", p. 5; see also attachments to Exhibit F (letters dated January 2, 1997 and January 28, 1998 from Formosa to Moss's counsel. The first of these letters appears to be misdated as January 2, *1997*, when it apparently should have been dated January 2, 1998).

12. Rec. Doc. No. 24, Exhibit "F", attachment (letter dated March 16, 1998).

13. Rec. Doc. No. 24, Exhibit "F", attachment (note dated May 14, 1998).

14. Fed.R.Civ.P. 56(c); New York Life Ins. Co. v. Travelers Ins. Co., 92 F.3d 336, 338 (5th Cir.1996); Rogers v. Int'l Marine Terminals, Inc., 87 F.3d 755, 758 (5th Cir.1996).

15. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

See also Gunaca v. Texas, 65 F.3d 467, 469 (5th Cir.1995).

16. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994) (en banc) (quoting *Celotex*, 477 U.S. at 323–25, 106 S.Ct. at 2553).

17. *Little*, 37 F.3d at 1075.

18. Wallace v. Texas Tech Univ., 80 F.3d 1042, 1046–47 (5th Cir.1996).

19. *Little*, 37 F.3d at 1075; *Wallace*, 80 F.3d at 1047.

20. *Wallace*, 80 F.3d at 1047. Accord, S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 494 (5th Cir.1996).

21. *McCallum Highlands v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.1995), as revised on denial of rehearing, 70 F.3d 26 (5th Cir.1995).

there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial.[22]

When affidavits are used to support or oppose a motion for summary judgment they "shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."[23] Affidavits that are not based on personal knowledge or that are based merely on information and belief do not satisfy the requirements of Rule 56(e), and those portions of an affidavit that do not comply with Rule 56(e) are not entitled to any weight and cannot be considered in deciding a motion for summary judgment.[24] Neither shall conclusory affidavits suffice to create or negate a genuine issue of fact.[25]

### 3. APPLICATION OF LAW TO FACTS:

After a complete review of the record, the Court finds that summary judgment is appropriate in this case because there are no genuine issues of material facts and the defendant is entitled to summary judgment as a matter of law.

As a preliminary matter, the Court notes that only Moss's claims pursuant to the FMLA are before the Court. In his complaint, Moss also alleged violations of the Louisiana anti-discrimination statute.[26] Moss subsequently conceded to the dismissal of these claims in his opposition to Formosa's summary judgment motion, saying,

Kevin [Moss] does not oppose the dismissal of his claims brought pursuant to the Louisiana Employment Discrimination Act for disability discrimination. As will be shown below, the protections of the Act may not have been available when Kevin [Moss] went out on employment but would have been implicated once he was returned to employment in accordance with the FMLA. Because he was not returned to employment, there is no way to judge these standards.[27]

Moss argues that Formosa violated the provisions of the FMLA by: (a) unilaterally forcing him to take twelve weeks of FLMA leave; and (b) failing to reinstate him at the conclusion of the leave. Formosa contends it is entitled to summary judgment based on the facts of this case. The Court finds that Formosa is entitled to summary judgment as a matter of law on the FMLA claim.

### (a) INVOLUNTARY FMLA LEAVE

Formosa's decision to place Moss on leave did not violate the substantive provisions of the FMLA or the regulations promulgated pursuant to the FMLA. Moss properly argues that Formosa was "obligated under the provisions of Section 2612 of the FMLA to allow [Moss] up to twelve (12) weeks unpaid leave if he encountered a serious health condition that [would make] him unable to perform the functions of the position for which he was employed."[28] However, nothing in the FMLA statute or any of the supporting regulations prohibited Formosa from requiring Moss to take unpaid leave.[29] Section 2612 of the FMLA provides:

**22.** Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

**23.** Fed.R.Civ.P. 56(e); Beijing Metals & Minerals Import/Export Corp. v. American Business Ctr., Inc., 993 F.2d 1178, 1182 (5th Cir.1993).

**24.** Richardson v. Oldham, 12 F.3d 1373, 1378–79 (5th Cir.1994).

**25.** McCallum Highlands v. Washington Capital Dus, 66 F.3d at 92; Travelers Ins. Co. v. Liljeberg Enterprises, Inc., 7 F.3d 1203, 1207 (5th Cir.1993); Salas v. Carpenter, 980 F.2d 299, 305 (5th Cir.1992).

**26.** Rec. Doc. No. 1, ¶ 3.

**27.** Rec. Doc. No., p. 1, FN1.

**28.** Rec. Doc. No. 1, ¶ 34.

**29.** Moss does not cite any cases which support the position that an employer may not place an employee on unpaid FMLA leave.

(a) In general

(1) Entitlement to leave

Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 work weeks of leave during any 12–month period for one or more of the following:

\* \* \* \* \* \*

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

Admittedly, many FMLA cases involve an employee *asking for* FMLA leave. However, there is nothing in the statute or jurisprudence which prevents an employer from placing an employee on unpaid leave. Two unreported district court cases are relevant to the issues presented in this case. In *Love v. City of Dallas,* the plaintiffs made a similar argument to the one presented in this case. The employer placed the employees on FMLA leave after a period of "limited duty." The employees complained that the involuntary leave violated the provisions of the FMLA. In rejecting the plaintiff's arguments and granting the defendant's summary judgment motion, the court said:

Besides the difficulty of arguing, in the same motion, that they are "disabled" yet do not have a "serious health condition," Plaintiffs also misinterpret and attempt to misuse the statute. Plaintiffs state that "[n]othing in the text of the FMLA or the [Department of Labor] regulations allows an employer ... to involuntarily put an employee on unpaid family leave." However, and more relevantly, nothing in the statute prohibits an employer from doing so \* \* \* Employers who force employees to take unpaid leave under the FMLA are really

only: (1) placing the employee on involuntary leave, and then (2) giving the employee the option of availing him or herself the benefits of the FMLA during the first twelve weeks of the leave \* \* \* Without explicit statutory language in the FMLA giving such plaintiffs the right to sue under it, however, the Court cannot find that Love and Taylor have standing to sue under the FMLA.[30]

In *Harvender v. Norton Company,* the Court reached a similar conclusion, finding that a plaintiff has "no right under the FMLA to bring an action against an employer for placing an eligible employee on leave." [31] The Court further said "nowhere in the act does it provide that FMLA leave must be·granted only when the employee wishes it to be granted. On the contrary, the FMLA only provides that leave must be given when certain conditions are present." [32]

This Court likewise finds that Moss fails to state a cause of action against Formosa for forcing him to take unpaid FMLA leave. The statute is designed to provide eligible employees with an adequate period of time to deal with family problems without concern about being terminated from their employment. Further, the statute attempts to provide reassurance to workers that they will not be asked to choose between continuing their employment, and meeting their personal and family obligations or tending to vital needs at home. An employee who asks for FMLA leave and who is otherwise qualified, may take up to twelve weeks of unpaid leave. Nothing in the statute prevents the employer from requiring an employee to take this leave, if the statutory conditions are otherwise met.[33]

---

**30.** 1997 WL 278126, \*6 (N.D.Tex.1997) (not reported).

**31.** 1997 WL 793085, \*6 (N.D.N.Y.1997) (not reported).

**32.** 1997 WL 793085, \*7.

**33.** The Court finds that Moss's epilepsy does qualify as a "serious health condition," thereby satisfying the requirements of the FMLA. This very same issue is fundamental to Moss's second argument, namely that Formosa violated the FMLA by failing to re-instate him at the end of the leave period. The Court will

## (B) FAILURE TO REINSTATE MOSS TO HIS POSITION

■ The language of the FMLA requires that when an employee returns from leave, the employee shall be either: (1) restored to their previous position or (2) restored to an equivalent position.[34] However, a company may not be required to reinstate certain "highly compensated" or "key employees" after FMLA leave if: (1) doing so would cause serious economic injury; (2) the employer gives proper notice to the employee; and (3) the employee elects not to return after receiving notice from the employer.[35] Moss acknowledges that this exception does not apply to his situation.

The plaintiff argues that the FMLA "clearly and unambiguously provides for mandatory reinstatement" because the statute only creates an exception for "highly compensated" or "key employees." This argument ignores the common sense interpretation of the FMLA statute and the implementing regulations. Clearly, some employees may *not* be able to return to work at the conclusion of their leave due to their family or medical situation. The implementing regulations recognize that some employees may not be entitled to mandatory reinstatement:

> (b) If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA. However, the employer's obligations may be governed by the Americans with Disabilities Act (ADA).[36]

It is clear that Moss's complaint does not assert a cause of action pursuant to the ADA.

The relevant issues before the Court are whether Moss was able to "perform the essential functions" of the position as control panel operator and whether his epileptic condition qualified as a "serious health condition" that rendered him unable to perform the functions of his job. Based on the evidence presented in connection with the pending motion for summary judgment, the Court finds that Moss was not able to perform the essential functions of his job at the conclusion of his FMLA leave. As a result, Formosa was not required to reinstate Moss at the conclusion of his leave.

Moss's job involved supervising the lines of production and communication between personnel in the Caustic Chlorine Plant at Formosa. An essential function of Moss's job involved responding to emergency situations at the plant. If Moss were to have an epileptic seizure during a plant emergency, he would be unable to perform a key component of his job. In addition, both he and his co-workers could potentially be at risk of serious bodily injury and the plant could be subject to substantial property damage. Moss's supervisor described the safety and emergency components involved in Moss's position saying,

> If the panel board operator is unconscious or dead, he could easily provide the field personnel with the wrong information. This would cause an adverse reaction, such as an unexpected release of chlorine gas. This could prove deadly to the field personnel and those persons around the plant * * * In most emergencies, however, the Panel Board Operator has a set order of tasks that he or she must accomplish within a very limited time frame. Being the "nerve center" of the Plant, many personnel depend upon the Panel Board Operator to inform

discuss this issue in the context of Moss's second argument.

34. 29 U.S.C. § 2614(a)(1)(A),(B).

35. 29 U.S.C. § 2614(b)(1).

36. 29 C.F.R. § 825.214. These regulations were implemented pursuant to Section 2654 of the FMLA which directs the Secretary of the Department of Labor to "promulgate such regulations as are necessary to carry out subchapter I."

them what steps to take in the event of an emergency. In addition, the Panel Board operators themselves have certain pieces of equipment that they are responsible for handling in case of an emergency.[37]

Moss argues his epilepsy does not pose any danger to himself or his co-workers because Formosa has significant "fail-safe" devices that would shut the plant down in the event of a leak.[38] Even with the safety devices, the control panel operator position plays an important role in preventing a chemical release. With the possibility that the "fail-safe" equipment itself could malfunction, it is clear that an employee in Moss's position must be alert at all times. Moss worked in the control room alone at times.[39] In fact, he was working alone on June 29, 1997, when he suffered a seizure that left him incapacitated for approximately forty minutes. This fact further supports the Court's conclusion that Moss's epileptic condition prevents him from performing an essential function of his job and significantly endangers Moss and others.

Several medical opinions indicate that Moss's condition was serious enough to prevent him from performing the essential functions of his job, thereby preventing him from returning to work at Formosa. Moss saw three doctors at the direction of Formosa who all concluded that Moss's condition precluded him from working in a safety position with toxic chemicals. Dr. Jonathan Roundtree saw Moss on several occasions and concluded that Moss should not return to work as a control board operator for the following reasons:

I have addressed this situation with Kevin's cardiologist, Dr. Jeffrey Moo-nan. He feels as I do, that even though Kevin's condition is not cardiac related and his cardiac tests are normal, that he cannot return to his previous duty as a chlorine board operator. This is based on the safety-sensitive nature of his employment and the severity of his seizures which I do not feel are controlled as of yet. I would recommend that a second opinion, with another neurologist to further evaluate Kevin's condition, would be in order, I would like to recommend, Dr. Neil Smith for this position as I have worked with him in the past and established a good rapport with him. * * * In summary, let me again state that I feel Kevin is not fit for duty in his old job, nor do his seizures show evidence of adequate control based on his previous episodes of loss of consciousness coupled with the safety-sensitive nature of his old job. I would recommend that other non-safety sensitive employment be made available to him.[40]

Likewise, Dr. Neil Smith concluded that Moss should not "be in a job where he will harm himself or other people should he loose consciousness briefly."[41] In opposition to these medical conclusions, Moss relies on a letter written by Dr. William Gladney who said Moss could return to work provided his job did not include working at heights. Dr. Gladney wrote:

I certainly think he can return to work as long as he is not climbing ladders and working in heights where having a seizure would product a fall or injury. He tells me he is a control panel operator and I think that his likelihood of having a seizure while working at his control panel is extremely low.[42]

**37.** Rec. Doc. No. 24, Exhibit "B", p. 3 (Affidavit of Paul Heurtevant). Two of Moss's other co-workers expressed similar opinions regarding the control panel operator position. See Exhibits "C", p. 2–3 (Affidavit of John David); Exhibit "G" (Heath Monte), p. 2.

**38.** Rec. Doc. No.28, p. 4.

**39.** Exhibit "B", p. 4; Exhibit "C", p. 2.

**40.** Rec. Doc. No. 24, Exhibit "N," attachment (letter dated August 12, 1997).

**41.** Rec. Doc. No. 24, Exhibit "O", attachment (letter dated September 10, 1997).

**42.** Rec. Doc. No. 24, Exhibit F, attachment (letter dated March 16, 1998).

A subsequent note calls Dr. Gladney's initial conclusions into question. On May 14, 1998, Dr. Gladney wrote a note saying "OK to work but he should *not* responsible for managing toxic chemicals."[43] When examined together, Dr. Gladney's letter and note support the Court's conclusion that Moss was not able to perform the essential functions of his job because of his condition. Dr. Gladney advised Moss not to climb ladders or work at heights because he was aware that Moss could loose consciousness at any moment. As discussed previously, the control panel operator was required to be alert in the case of emergency. Moss's condition prevents him from doing so. Similar to losing consciousness on a ladder, Dr. Gladney recognized that Moss could loose consciousness while working at the control panel and not be able to perform the functions incident to his job. If a seizure occurred while Moss was on duty, he would be unable to react in an emergency situation. Gladney's second note is evidence of this conclusion.

### 4. CONCLUSION:

Based on the entire record in this case, the Court finds that the defendant is entitled to summary judgment as a matter of fact and law. The plaintiff's serious medical condition prevented him from performing the essential functions of his job, and as a result, Formosa was not required to reinstate him at the end of his FMLA leave. Therefore: IT IS ORDERED that the defendant's motion for summary judgment is hereby GRANTED.

The plaintiff also alleged a cause of action under the Louisiana anti-discrimination statute.[44] In his opposition to Formosa's motion for summary judgment, Moss conceded this claim.[45] Therefore: IT IS ORDERED that plaintiff's claims brought pursuant to the Louisiana anti-discrimination statute are also dismissed with prejudice.

Judgment shall be entered accordingly.

---

**43.** Rec. Doc. No. Exhibit "F", attachment (note dated May 14, 1998). The plaintiff suggests that Dr. Gladney's second note was improperly influenced by Formosa. Rec. Doc. No. 28, p. 3, FN3. Moss, however, offers no support for this proposition.

**44.** Rec. Doc. No. 1, ¶ 3.

**45.** The Court previously discussed Moss's consent to dismissing the state law claims at page 740, supra.